72 P.(2d) 1088

## STATE v. MILLER.

No. 4297.

Supreme Court of New Mexico.

Oct. 6, 1937.

Rehearing Denied Nov. 12, 1937.

E. M. Grantham, of Clovis, for appellant.

Frank H. Patton, Atty. Gen., and A. M. Fernandez, Asst. Atty. Gen., for the State.

HUDSPETH, Chief Justice.

The defendant was convicted of horse stealing and appeals. The subject of the larceny was last seen by his owner in the summer of 1935 on the open range 15 miles south of Vaughn in Guadalupe county— 18 miles from the De Baca county line. In December, 1935, he was ranging on the ranch of Walter Overton, near Yeso, in

De Baca county, 35 miles from his usual range. The defendant is charged with stealing the horse in De Baca county. Walter Overton, defendant's witness, testified as follows: "Well, sir, the first time I noticed that horse he was there at my place. * * *"

On cross-examination he testified:

"Q. Do you know how it came there? A. No sir.

"Q. It was ranging there? A. Yes sir.

"Q. You do know that John Riley took the horse up, rode it a few days, and fed it? A. Yes sir.

"Q. Over how long a period? A. I could not say; he was there most of the winter.

"Q. You knew at the time he was not John's horse? A. Yes sir.

"Q. He never made any claim to the horse? A. No sir.

"Q. And he took the horse away? A. Yes sir.

"Q. About when was that, would you say, In the Spring of this year? A. Yes sir.

"Recross-Examination

"* * * Q. Had you seen the horse on your premises before John had ridden him? A. Yes, there were a few stray horses on my place; I could not say about this one, but there were a few stray horses on my place.

"Q. Then you saw John riding this horse and you knew it was a stray horse? A. Yes sir, he told me it was a stray horse."

The defendant, in a voluntary statement made to the sheriff, said they had accused him of stealing a slash J horse and they were calling it a slash U; that the slash J brand belonged to a relative of his in Arizona; and that the relative would appear at the trial. Cage Riley, father-in-law of the defendant, was placed on the stand by the State and he also maintained that the brand on the horse was a slash J. He testified that he had seen his son, John Riley, with the horse, and that the defendant had the horse and a dozen or more other horses at his place in July; that after stayinqg all night he departed with the horses in the direction of Portales. Shortly thereafter the defendant sold the horse near Portales in Roosevelt county, and when the scrivener, who was preparing the bill of sale for defendant's signature, asked him, "What brand?" he replied, "V bar," and that brand was placed in the bill of sale which the defendant executed and delivered with the horse.

The points relied upon for reversal are all based upon alleged error in the overruling of a motion for an instructed verdict, on the grounds of total failure of proof of venue, and that there was no substantial evidence that the defendant committed the larceny. Appellant made no objection to the court's instructions to the jury. There is no dispute as to the ownership of the horse nor that it was stolen, nor is there serious question as to the identity of the animal which the appellant had at the Cage Riley ranch in July with the

subject of the larceny. Cage Riley described the brand as a slash J, as did the appellant in his conversation with the sheriff, but Riley had talked with the owner after the horse was recovered and testified that he knew the horse. The dispute was as to the brand the horse bore and not as to the identity of the animal.

The Attorney General suggests that the horse strayed from his range in Guadalupe county into De Baca county. It is a well-known fact that in that open range country cattle and horses will stray or drift many miles. James F. Hinkle, in "Early Days of a Cowboy on the Pecos," states: "We would send men out on the outside work and they would often be away for six months. They would work with the outside wagons and throw the cattle back towards the headquarters ranch. Often they would work as far south as Pecos town on the Pecos, and sometimes below that, and as far north as old Fort Sumner, a distance up and down the river of two hundred, and fifty miles. * * * Some winters the cattle would drift south very much. I call to mind one roundup on both sides of the Pecos from Seven Rivers to the Berrendos, just north of Roswell, when there had been a great drift of cattle from as far north as the Canadian. Our outfit was on the west side of the river and was one of twenty-two wagons on that work. It took about thirty days to do that work for we would have large numbers of cattle in each roundup. The cattle were largely on out waters, that is, surface wa-ter holes and lakes, and the drive would have to go out each morning twenty miles or more to get around the cattle. At the clean up at Roswell there were fifty thousand cattle under herd to be taken back to the various ranches."

However, the method of the animal's escape or removal seems immaterial (3 C.J. S., Animals, 1200; 2 Am.Jur. 795), since, according to the defendant's witness, the horse was ranging for months in De Baca county before he was sold by the defendant on the 17th day of July, 1936. The horse was referred to by the witnesses as an estray on the Overton range. We have a statute defining an estray, 1929 Comp. St. § 4-1501, which provides: "Any bovine animal, horse, mule or ass, found running at large upon public or private lands, either fenced or unfenced, in the state of New Mexico, whose owner is unknown in the section where found, or which shall be fifty miles or more from the limits of its usual range or pasture, or that is branded with a brand which is not on record in the office of the cattle sanitary board of New Mexico, shall be known as an 'estray.' "

The 'slash U brand was duly recorded and the Overton ranch was not 50 miles from the usual range of the horse, hence he was not an estray under the provisions of our statute. Although if he were an estray in the physical possession of a taker up the property in the horse under such circumstances might be laid in the true owner. Quinn v. People, 123 Ill. 333,

15 N.E. 46; Palmer v. State, 70 Neb. 136, 97 N.W. 235; Moore v. State, 8 Tex.App. 496.

Appellant's attorney in an able brief strenuously argues that the testimony fails to prove the taking of the horse by the defendant in De Baca county beyond a reasonable doubt; and lays particular emphasis upon the use of the horse by John Riley, a brother-in-law of defendant and son of Cage Riley. John Riley rode the horse from time to time, but he made no claim of ownership and repeatedly stated that the horse was a stray. So far as the record shows, the horse was never out of De Baca county from the time he entered it in the year 1935 until in July, 1936, when the defendant had possession of him in Roosevelt county. This, in connection with the Cage Riley testimony, was sufficient evidence to justify the jury in finding that the horse was in De Baca county when taken.

The appellant's subsequent conduct and dealing with the horse may be looked to to show with what intent he first took possession of him. Shortly after leaving the Cage Riley ranch he sold the animal under a false brand and claimed in his statement to the sheriff that it bore another. The possibility of mistake is eliminated by the defendant's statements. This, with his unexplained possession of the stolen horse, is sufficient to make a prima facie case of guilt and establish the corpus delicti. State v. Lott, 40 N.M. 147, 56 P.(2d) 1029; State v. Ortega, 36 N.M.

57, 7 P.(2d) 943; State v. Hussey, 188 Wash. 454, 62 P.(2d) 1350; Note, 19 Ann. Cas. 527; Levering v. Commonwealth, 132 Ky. 666, 117 S.W. 253, 136 Am.St.Rep. 192, 19 Ann.Cas. 140.

For the reasons stated, the judgment should be affirmed, and it is so ordered.

SADLER, BRICE, and ZINN, JJ., concur.

BICKLEY, Justice (dissenting).

I am unable to concur in the foregoing decision.

The court instructed the jury as follows: "The Court instructs you further, Gentlemen, that if you do not believe from the evidence that the said horse was taken, led or driven away from the County of De Baca, and the said owner of said horse deprived his possession in the County of De Baca, as alleged in the information, still, the Court instructs you that if you believe from the evidence beyond a reasonable doubt that the Defendant Cliff Miller, at some other county in the State of New Mexico, on the 21st day of June, 1935, or at some other time within three years prior or to the date of the filing of the information herein in this court, to-wit, on the 12th day of October, 1936, did, knowingly and intentionally, deprive the said owner, W. S. Parker, without his consent, of the immediate possession thereof, and after so taking, leading and driving away of said horse, did immediately bring the same into the County of De Baca, in the State of

New Mexico, and that the taking, leading and driving away of said horse from the place where it had been left by the owner, and the bringing of the same into the County of De Baca was one continuous act and transaction, and with the continuous intent to deprive the owner of the immediate posssession thereof, then the Court instructs you that you may find the Defendant Cliff Miller guilty in manner and form as charged in the information."

The giving of this instruction indicates a doubt in the court's mind that the evidence showed that the horse was taken, led, or driven away from the county of De Baca.

There is no evidence to connect the defendant with the taking of the horse from the place where it had been left by the owner in Guadalupe county in the summer of 1935; there is no evidence that the defendant brought the same into De Baca county; the person next seen with the horse after the owner lost it in Guadalupe county was John Riley, who had it in his possession as a stray horse for weeks before any connection of defendant is shown with it. It appears that the possession of the horse by John Riley intervened between the owner's immediate possession and any connection by defendant with it. John Riley apparently rode the horse away from De Baca county into Roosevelt county and defendant became possessed thereof in Roosevelt county. How then can it be said that defendant deprived the owner, Parker, "of the immediate possession thereof"?

The guilty connection of defendant with the horse in Roosevelt county, which was substantially a year later, rests solely upon his unexplained possession of it there and does not raise a presumption that the horse was stolen, much less did it raise a presumption that defendant had stolen it from Parker, the owner, in Guadalupe county, or that he had at some time or other taken it into De Baca county or had taken it therefrom.

Particularly is such presumption unreliable since the jury were not instructed as to the probative force of the unexplained possession of stolen property, if it had been stolen, and as to the necessary elements of the recency of the possession as related to the time of the theft and other elements necessary to be shown to exist before such presumption may be said to arise. It is true the appellant did not request such an instruction, but it appears to me that where the State must rely solely, as in the case at bar, upon circumstantial evidence for conviction, the court should instruct as to the qualities of effective circumstantial evidence whether requested to do so or not. See Territory v. Lermo, 8 N.M. 566, 46 P. 16, cited by the Wyoming Supreme Court in Gardner v. State, 27 Wyo. 316, 196 P. 750, 15 A.L.R. 1040, where the court decided: "The court should instruct on law of circumstantial evidence where such evidence is alone relied on for conviction, although the instruction requested by accused is erroneous, and he requests no other instruction on the subject, and takes no ex-

ception to the court's failure to give one where the statute requires the court to charge the jury."

In the course of the opinion the Wyoming court cited many cases to support that view, and quoted from a note in 97 Am. St.Rep. p. 790, as follows: "In order to secure justice, it is the duty of the trial judge, even without request, to instruct the jury as to this kind of evidence, where the case is based solely thereon. * * * Territory v. Lermo, 8 N.M. 566, 46 P. 16. * * *"

It would be putting too heavy a burden on the defendant to require him to ask the court to instruct the jury of the existence of a presumption available to the prosecution arising from the evidence in order to demand that the cautionary elements usually accompanying such instruction should be included in order to make the presumption effective. In other words, the presumption is one which has been formulated out of experience for use in convicting those charged with theft and is a part of the State's case. Why should the accused be required to help the prosecutor make a case against him in order to insist that the case be not improperly made? In State v. Diaz, 36 N.M. 284, 286, 13 P.(2d) 883,

the conclusion was reached that there are exceptions to the rule that nondirection is no cause for reversal unless the accused had invoked such nondirection as an error at the trial. In that case it is suggested that there are situations in which it would embarrass the defendant and demand too much of him to require that he point out to the court the only legal principles and facts upon which the jury can convict him. Under the principles announced in State v. Reed, 39 N.M. 44, 39 P.(2d) 1005, 102 A. L.R. 995, it is extremely doubtful if the jury had a right to take into consideration the presumption or inference of guilt arising from possession of stolen property in the absence of a guiding instruction from the court as to the legal effect of such possession.

That the unexplained possession by one of property belonging to another does not raise the presumption that a larceny has been committed, and that the possessor is a thief, and that additional evidence is necessary to establish the corpus delicti is established law. See State v. White, 37 N. M. 121, 19 P.(2d) 192.

In my opinion, the administration of justice should require the reversal of the judgment. I therefore dissent.